OPINION OF THE COURT
Kristin Booth Glen, S.
This case raises important questions about the obligations of fiduciaries, including institutional trustees, to beneficiaries, with disabilities, of trusts that seek to provide for the welfare of those beneficiaries. A review of the history of this trust and related proceedings places the issue in sharp perspective.
This history reveals a severely disabled, vulnerable, institutionalized young man, wholly dependent on Medicaid, unvisited and virtually abandoned, despite a multimillion dollar trust left for his care by his deceased mother. It reveals two cotrustees, one who was personally involved with the deceased and who holds himself out as an expert in planning for children with intellectual disabilities, and one which is a major banking institution, neither visiting or inquiring after the beneficiary’s needs nor spending a single penny on him.
The history turns brighter after a serendipitous SCPA article 17-A proceeding, where the cotrustees were called to task, educated about available services, and hired a certified care manager to attend to the beneficiary’s needs. That intervention, now after almost four years, has dramatically improved the beneficiary’s quality of life and his functional capacity to enjoy what is now a near “normal” existence in the community.
This history, and the legal consequences that flow from it, discussed below, should provide a clarion call for all fiduciaries of trusts whose beneficiaries are known to have disabilities to fulfill their “unwavering duty of complete loyalty to the beneficiary” (106 NY Jur 2d, Trusts § 247) or be subject to the remedies available for breach of their fiduciary obligation.
History
Will and Trusts
Marie H. died on March 20, 2005 at the age of 85, survived by two adopted children, Charles A.H., and Mark C.H., then 16 years old. Prior to her death, upon learning of her terminal cancer, Marie searched for an appropriate residential setting for Mark, and ultimately placed him in the Anderson School in *365 Straatsburg, New York.[1] Mark’s disabilities are described more fully below.
In her will, Marie left her entire estate to the Marie H. Revocable Trust of 1995, created by trust agreement dated March 23, 1995 (the Revocable Trust).[2] The Revocable Trust provided that, upon Marie’s death, after dividing her tangible property between her two children, the balance was to be divided into two equal shares, one for Mark’s trust, and one for Charles’s trust. The will, also dated March 23, 1995, named her sister Betty as executor and guardian of the person and property of her minor children. Marie’s attorney, H.J.E, was named the successor executor.
The will was admitted to probate on July 5, 2005. Because Betty predeceased Marie, letters testamentary issued to H.J.E[3] The federal estate tax return (the 706) indicated a gross estate of approximately $12 million, of which $2,575,000 was the date of death valuation of Marie’s co-op apartment, and $8,973,653.79 was the date of death value of her stocks and bonds. Other miscellaneous property was valued at $471,439,77. According to the 706, the only assets that were transferred to the Revocable Trust during Marie’s lifetime were two Citibank accounts totaling $1,390.41.
The 706 estimated the executor’s commission at $133,000 and attorney fees at $300,000,[4] with other administration expenses[5] shown as $462,717.45. Federal estate taxes were shown as $3,479,561.55.[6]
*366 On the same day that she executed her will and the Revocable Trust, March 23, 1995, Marie entered into two irrevocable trust agreements, one for Charles and one for Mark, the Mark C.H. Discretionary Trust of 1995 (the Mark Trust), with herself and Betty as trustees. H.J.R was named successor trustee if either of the two named trustees should cease to serve, and, upon Marie’s death, the Chase Manhattan Bank, N.A. (Chase) was designated as additional trustee “to serve with the other Trustees in office.” The Mark Trust was funded with an initial contribution of $18.
It is clear that the Mark Trust is for the benefit of a person with disabilities.[7] Article 2.1 provides for distributions of income and principal to Mark for his “care, comfort, support and maintenance,” in the trustees’ discretion, and further provides:
“(ii) In the event such net income shall in any year be insufficient to provide for the support, maintenance, care and comfort of the beneficiary or for necessary medical expenses as determined by the Trustees, in their sole and absolute discretion, the said trustees shall expend out of the principal of said fund such sums as they deem necessary for any such purposes. Before expending any amounts from the net income and/or principal of this trust, the Trustees may wish to consider the availability of any benefits from government or private assistance programs for which the Grantor [sic] may be eligible and that where appropriate and to the extent possible, the Trustees may endeavor to maximize the collection of such benefits and to facilitate the distribution of such benefits for the benefit of the beneficiary.”
In article 2.1, section (iii) continues, authorizing the trustees “to pay or apply ... to any facility [the beneficiary] may be *367 residing in and/or to any organization where he may be a client or a participant in any program (s) sponsored by them, as the Trustees shall determine, for the general uses of such facility and/or organization.”[8]
Article 2.1, § (v) gives the trustees the right to terminate the trust “as if the beneficiary were deceased” if the existence of the trust causes the beneficiary to be excluded from government benefits.
The Account
After probate of Marie’s will, in the SCPA article 17-A proceeding, described below, this court, sua sponte, ordered H.J.P and Chase to account as trustees of the Mark Trust,[9] noting, “questions having arisen as to whether the funds intended by Marie H. to benefit Mark . . . had been duly applied by [sic] for such purposes by her chosen fiduciaries.” The court appointed a guardian ad litem (GAL) for Mark in this accounting proceeding (SCPA 403 [2]).
On December 7, 2010, the trustees filed an amended accounting covering the period of March 23, 1995 through March 31, 2010. Schedule A of that accounting showed the total amount of principal received as $1,420,343.28. In objections filed by the GAL, he noted his belief that, with a net estate of approximately $10 million, the Mark Trust should have been funded with $5 million. After meeting with Chase’s attorney, he concluded, based on her statements to him, that estate taxes of $3,479,561.55 accounted for the diminution of the amount with which the Tmst was funded. This, of course, was clearly not the case, as the estate tax would have been paid before distribution of the residuary estate, first to the Revocable Tmst, and from there, in equal shares to the Mark Trust and the trust for Charles. If, in fact, all the estate taxes were somehow allocated to Mark’s share, a major error would have occurred.
Schedule G, “the Statement of Principal Assets on Hand,” as of March 31, 2010, showed a market value of $2,733,094.49. The substantial increase over the amount shown as principal received in 2005 is, however, not due to investment strategies but rather, according to a subsequent communication from Chase, the result of underreporting the initial principal received *368 with many securities incorrectly listed at a $0 inventory value on schedule A.[10]
Schedule C shows commissions paid to the trustees in amounts of $17,622.53 to H.J.P. [11] and $34,914.61 to Chase.[12] Significantly, schedule G-l shows income on hand of $248,881.36, while schedule E-l, distribution of income, shows $0. The statement of administration expenses chargeable to income, schedule C-2, totals $29,493.49, of which the largest items are the commissions paid to the trustees. Of the total administrative expenses and taxes shown on schedule C, New York State income taxes (after substantial refunds) constituted $7,158.54; federal income taxes (after substantial refund) were $6,367.70; commissions were, as already noted, to Chase ($34,914.61) and H.J.E ($17,622.53); H.J.E’s firm’s legal fees were $11,500; the fees of the guardian ad litem were $7,375; and the fees of Staver Eldercare Services (the care manager hired for Mark as a result of the article 17-A proceeding) were only $3,525.
The almost negligible amount paid to Staver, beginning in February 2009, is the only money paid out for the benefit of Mark, the disabled beneficiary, in five years. That is 1.4% of the income on hand at the end of the accounting period and 3.6% of all expenses. On an almost $3 million trust, the money spent on the beneficiary, over a five-year period — and only because of the court’s intervention — was approximately 0.1%.
The Article 17-A Proceeding
In October 2006, H.J.E brought a proceeding pursuant to article 17-A to be appointed as guardian of the person[13] of Mark. In support of his petition, he submitted affirmations from two *369 health care providers. One, Robert C. Williams, Ph.D., described Mark as “[p]rofound[ly] mentally retarded, suffering from autism,” as well as “non-verbal and engaging] in numerous repetitive and self stimulating behaviors.” Dr. Lynn Liptay provided a diagnosis of autism and mental retardation, noting that Mark was “nonverbal and requires constant supervision and assistance with all ADL’s,”[14] and, as well, that he “engaged in frequent aggressive behaviors including spitting, throwing objects and hitting his own head.”
Because Mark was living in an institution, he was represented by Mental Hygiene Legal Services (MHLS) (Mental Hygiene Law § 81.07 [g] [1] [vii]). The report of the principal attorney for MHLS in the Second Department, who visited him there, notes that, according to the Anderson School records, Mark “has the receptive communication skills of someone less than two years old and the expressive skills of a three month old.” The attorney described her visit to Anderson and her observation of Mark: “ [Effective communication was not possible, [Mark’s] only responses were facial grimaces and attempts to return to his classroom chair. He remained nonverbal, did not make eye contact, and appeared to be responding to internal stimuli.”
At the initial hearing, on September 18, 2007,[15] where Mark’s presence was excused,[16] H.J.E revealed that, although he was applying for guardianship as a result of a promise to Mark’s mother on her death bed, he had not seen Mark since Mark was six years old, when Marie brought him and Charles to H.J.E’s law office. H.J.E had never visited Anderson to ascertain Mark’s condition nor, more critically, his needs,[17] nor had he inquired of the staff about any unmet needs. Also revealing the existence of *370 Mark’s trust[18] and his position as cotrustee, H.J.E admitted that he had not expended a single dollar on Mark’s behalf in almost three years.
I adjourned the hearing to permit the other cotrustee to appear. Subsequently, a representative of Chase came to court with H.J.E in response to my instruction; Chase’s “excuse” for inaction was its lack of institutional capacity to ascertain or meet the needs of this severely disabled, institutionalized young man. If the bank lacked such expertise, I noted, they should obtain the services of someone who could assess Mark’s situation and ascertain his needs. After some initial missteps, H.J.E and Chase retained the services of a certified care manager with extensive experience with people with intellectual disabilities, Robin Staver, M.S., Ed., CMC.
First contacting, and then visiting Anderson, she learned of a list of items the professionals there believed would enhance Mark’s quality of life and assist his learning and development. Over the past four years she has, as a representative of the trustees, been actively involved in Mark’s life and care, attending meetings, in person or by phone, planning meetings, arranging medical and other consultations, purchasing equipment, including assistive communication devices, recreational materials, clothing, etc., and providing for Mark’s first forays into the community. What follows is a brief snapshot of the extraordinary — and heartwarming — progress Mark has made since the funds his mother left for his care have been well and thoughtfully used for that purpose.[19] The detail included, what anthropologists call a “thick description,” is important in *371 understanding how apparently trivial expenditures and interventions can have a huge impact on the progress and quality of life of a person with intellectual disabilities.
December 2008
This was Staver’s first meeting with Mark and the staff at Anderson. She noted that
“Mark enjoys swinging and climbing outdoors. However, there is no playground in the vicinity of his residence. [In response to communications about Mark’s needs, initiated by the court,] in August a proposal for a play structure with swings and Adirondack chairs was sent to H.J.E To date, no plans for the structure are in place.”
The residence manager poignantly told Staver that “as far as she knew, Mark has not had any visitors in the five years she has worked with him nor has he had a vacation. She stated that most of the students leave the school over Christmas vacation, and Mark remains on campus with staff.”
Staver reported on Mark’s pharmacological regime at the same time that she recommended an independent neurology consult with a non-Medicaid neurologist and a speech evaluation “to determine appropriate augmentative communication devices and purchase those devices.” Significantly for the issues presented here, Staver reported that “Mark currently takes Keppra 500 mg. which is covered by Medicaid. However, this medication causes adverse reactions including physical aggression, agitation, frustration and vocalizations. Keppra SR, which is an extended release medication, causes fewer side effects, but is not covered by Medicaid.”[20]
Staver also recommended the purchase of a personal computer and computer programs for Mark’s room, an electric synthesizer and/or electric keyboard, gift certificates for restaurants and clothing stores, the playground system and outdoor chairs previously requested, a one-week vacation to Disney World with two staff members on duty 24 hours a day, and a recliner chair with massage capabilities.[21]
*372 July 2009
Mark “graduated” from the special ed program in June,[22] and was being prepared to enter a vocational program and to move to an IRA (individualized residential alternative) residence in the community. He still required assistance with some ADL’s (tooth brushing, applying deodorant) but was able to dress himself independently, eat with regular utensils and drink from a cup. He demonstrated “a limited sense of safety and require[d] supervision when out in the community.” He had no skills in the areas of money, time-telling or calendar recognition. While he was still engaging in aggressive behavior, he was also enjoying some community activities including playing ball and watching videos. As previously reported, “Mark loves to climb on the playground and go on the swings. He smiles and will reciprocate gestures such as high fives or handshakes.” Staver also reported that Mark was now using the PECS (picture exchange communication system) for communication with others, and had made “significant progress,” although the speech pathologist recommended that an augmentative communication device be purchased to further enhance Mark’s communication skills.
April 2010
Mark continued to reside on the Anderson campus, awaiting completion of a new IRA site targeted for December 2010. In January 2010, he transitioned from Anderson’s education program to adult day habilitation services. Mark, still entirely nonverbal, continued to use the PECS, but his inability to communicate effectively with others made it “difficult for him to self-regulate when transitioning from one activity to another . . . [causing him to become] agitated and exhibi[t] aggressive behavior.”
Because of frequent signs of aggression, the residence manager “requested contact information for Mark’s brother. Staff would like him to visit Mark. After Mark’s mother died, he no longer had any contact with his brother. [The residence manager] believes that it would be beneficial for Mark emotionally to see his brother again.” Finally, Staver reported that she had now been able to purchase gift certificates for a computer and headphones, clothing for Mark, grocery items, and meals in local restaurants. Recommended items included two air puri *373 fiers,[23] a portable DVD player, a radio with wireless headphones, a recliner chair, and more gift certificates for restaurants in the community.
August 2010
Mark was just about to move to his new housing; because he “does not adapt well to change,” he was exhibiting more outbursts of aggression, including lunging and throwing items while in the van that takes him to and from his day program. The behavior specialist instituted a protocol for use of a safety harness in the van, but also
“stated that Mark would benefit from use of enjoyable sensory items in the van. These items will assist in calming Mark and hopefully turn the van ride into a positive experience. [The behavior specialist] will consult with . . . the Occupational Therapist regarding items to be purchased for Mark . . . [and] forward all requests to [Staver].”
Staver reported that since her last report, she had purchased a touch screen computer, a computer table, Boardmaker Plus! software, clothing and certificates for dining out in the community, and was planning to purchase additional needed items once Mark moved to his new residence.
November 15, 2010
Staver reports purchasing an iPad, and gift cards to Best Buy for accessories and apps, a trampoline, a recumbent bike, augmentative communication devices, educational puzzles and, as requested, “sensory items.”
March 2011
Mark transitioned well to the Plutarch Residence. He “continues to exercise daily, enjoys taking long walks, brushes his teeth independently, helps with the laundry, and participates in afternoon meetings.” He was progressing toward having “40 van rides without lunging out of his seat” so that the safety harness could be discontinued. In addition, “Mark continues to show significant improvement during community integration. He enjoys meals, bowling, haircuts and shopping.” Staver reports that she purchased for Mark’s new residence a laptop computer, a 32-inch television, a mattress and box spring, headboard and footboard, a rocker/reclining chair with heat and *374 massage, a recumbent bicycle, a trampoline and rubber mats for safety.
Under consideration for purchase were playground equipment for use at Mark’s residence, a trampoline to be used at Mark’s day program, Wii and XBox, a hammock, an iPad, and a Mayer-Johnson Tech/Talk augmentative communication system that aids users to communicate using direct selection.
August 26, 2011
Mark was reported to have continuously improved in the tasks and activities of daily life in his new residence, “participating] in household tasks including putting laundry in the washing machine and transferring clean clothes to the dryer; reviewing his daily schedule, removing his plate from the table after meals, scraping the plate, rinsing it off and putting it in the dishwasher.”
The importance of exercise was noted,[24] with Mark “playing basketball, walking, sprinting and running, as well as using an exercise ball, recumbent bike, Wii exercises and a trampoline at home.” He no longer required the safety harness in the van and, in the classroom, “accepts changes in his routine, shortens break time himself, interacts more with staff and is able to sit and complete tasks.” The speech language pathologist noted that Mark’s use of the recently purchased XBox allowed him to “pair an enjoyable game with work tasks and aid in peer interactions.”
Staff requested purchase of a number of items including an iPad with apps for music, communication, labeling and categorization; a Proloquo2Go for augmentative and alternative communication; wireless headphones for music [for self-soothing] at his day program; Boardmaker software for communication pictures and symbols; and sensory items including a compression vest, hand held massager, and neck/shoulder weighted compression.
November 2011
Staver wrote to H.J.E: “Staff reports that Mark has benefited from recent purchases [of the items noted in the August 26, 2011 report] on his behalf’ and, as well, “I am working to coordinate a visit with Mark’s brother. Staff thinks this would be beneficial to Mark.”
*375 July 2012
Mark was now ensconced in his IRA, where he had his own room, and where he was making substantial progress in communicating. He was able to lose the weight he gained over the winter through portion control and exercise, including his trampoline and recumbent bike. He showed “significant progress in the classroom” and “mastered most tasks including attending speech and occupational therapy sessions without staff accompaniment.” He participated in preparation for the Special Olympics 50-meter run, though ultimately he was unable to start.[25]
The staff had begun planning a vacation for Mark, beginning with an introduction “to an amusement park and/or water park to see how he reacts and how accepting he is to new activities.” Options for the vacation include Disney World, as previously suggested by Staver, Autism on the Seas, a cruise for autistic individuals and their families/residential staff, and autism-friendly Broadway shows.
Also reported: “The case manager is working with Mark’s brother, Charles, to facilitate a visit to Mark.”
September 24, 2012
Despite some new physical problems, the most recent communication was positive on many fronts. Mark is reported as “using pleasant table manners” and using PECS, and is able to make his own choices for meals and snacks. He clears the table after meals, rinses and puts dishes in the dishwasher, and independently takes his laundry from his room to the laundry room where he places it in the washer without prompts. He “showers independently” though with a staff member nearby due to his seizure disorder. He “has become less prompt-dependent at home” and “will independently leave the living room to go upstairs to his room or to the bathroom and return to the living room alone.” As an example of his increasing life skills, Mark is reported to enjoy walking on the rail trail, after which “Mark likes purchasing a drink, and especially likes receiving change from his payment.”
Demonstrating the beneficial results of purchases made for him, his “gross motor skills have improved. He enjoys bouncing *376 on the trampoline, using it as a sensory activity ... He likes having meals in restaurants and enjoys dressing up prior to going out for dinner.”
His communication skills are also improving, in part because of the devices that have been purchased for him and that are being incorporated into his regimes. According to the report, “Mark uses sign language to communicate the words ‘cracker’ and ‘apple.’ He uses the Super Talker 8 for dinner and chooses the foods he likes. Mark will start using programs on his iPad at home.” And, as an apparently small, but enormously encouraging, advance, Staver reports that, as she was leaving Mark’s classroom, he waived “bye” and, although previously entirely nonverbal, said, for the very first time, “buh”!
Finally, as a truly happy ending, Staver reports that she
“facilitated a visit and accompanied Mark’s older brother Charles to see Mark at his residence on September 22, 2012 . . . [Charles] stated that he was amazed at the progress Mark made in the last 8 years. He also said he felt reassured by the staffs caring, sensitivity and commitment to their clients. He said he knows Mark thrives because of the environment he’s in and looks forward to bringing his family to meet Mark in the near future.”
Discussion
As this history demonstrates, once the trustees were required to make themselves knowledgeable about Mark’s condition and his needs, and the availability of services that would enable them to provide for those needs, they began, and continue to use funds from his trust for the purposes his deceased mother anticipated and so deeply desired.
The history brings into sharp focus the obligations of trustees, both individual and institutional, to the beneficiaries of trusts they administer when they know,[26] or should know,[27] that those beneficiaries have disabilities, and have medical, educational or quality of life needs that can and should be met from tmst income.
*377 It is fundamental that a fiduciary takes on obligations beyond those imposed by ordinary relationships or transactions; in the oft-quoted works of Judge Cardozo, her responsibility is “something stricter than the [mere] morals of the market place . . . but the punctilio of an honor the most sensitive” (Meinhard v Salmon, 249 NY 458, 464 [1928]). This is no less the case for trustees, who have “an unwavering duty of complete loyalty to the beneficiary of the trust to the exclusion of the interests of all other parties” (106 NY Jur 2d, Trusts § 247).
The Mark Trust empowers the trustees with “absolute discretion,” gives them latitude to withhold or pay out income, and, in the event of an income shortfall, to invade the principal, for the “care, comfort, support and maintenance” of Mark and his descendants. However, the words “absolute discretion” do not insulate the trustees, even trustees of lifetime trusts, as here, from liability.
Article 6.1 purports to absolve the trustees from a duty to account (except for a final account). That violates public policy and cannot be enforced (Matter of Malasky, 290 AD2d 631 [3d Dept 2002]) where, as here, the beneficiary is a person under a disability, and no one is protecting the beneficiary’s interests (Matter of Shore, 19 Misc 3d 663 [Sur Ct, NY County 2008]). In an accounting, the court can assess the trustees’ failure to take reasonable interest in and action on behalf of Mark.
The trustees left Mark to languish for several years with inadequate care, despite the fact that the Mark Trust had abundant assets. In so doing, the trustees failed to exhibit a reasonable degree of diligence toward Mark. Courts will intervene not only when the trustee behaves recklessly, but also when the trustee fails to exercise judgment altogether (“even where a trustee has discretion whether or not to make any payments to a particular beneficiary, the court will interpose if the trustee, arbitrarily or without knowledge of or inquiry into relevant circumstances, fails to exercise the discretion”) (Restatement [Third] of Trusts § 50, Comment b). That is, sadly, precisely what occurred here.
The plain language of the Mark Trust elucidates Marie’s intent in its creation. Article 2.1, § (iii) authorizes the trustees to pay any income not applied for Mark’s benefit “to any facility he may be residing in and/or to any organization where he may be a client or a participant in any program(s).” This provision reflects both the importance of Mark’s quality of life to Marie and the minimum knowledge that Marie expected her trust *378 ees to have about Mark and his situation. In order to exercise their discretionary power of expenditure, at the very least they are required to take steps necessary to keep themselves fully informed of Mark’s residential situation and ancillary services. It is not sufficient for the trustees to simply safeguard the Mark Trust’s assets; instead, the trustees have a duty to Mark to inquire into his condition and to apply trust income to improving it. The trustees abused their discretion by failing to exercise it. H.J.E’s complicity is exacerbated by the fact that as drafter of the Mark Trust, as well as the drafter of Marie’s will, he was aware of Mark’s incapacity for years before serving as trustee.
Although New York case law concerning inactive fiduciaries is sparse, the Appellate Division has clearly ruled that executors may not deny a needy beneficiary payment from an estate under circumstances far less compelling than those presented herein. In Matter of Van Zandt (231 App Div 381 [4th Dept 1931]), the decedent bequeathed his real property to his sons subject to a life estate in the same property to his wife. As in the Mark Trust, the decedent gave his executors discretion over spending, authorizing but not requiring them to invade the trust corpus if the income supplied by the widow’s life estate was insufficient for her “care, support and maintenance” (id. at 383). As in the Mark Trust, decedent’s will gave the executors wide latitude “to expend ... so much of the corpus of his estate as, in their opinion, might be necessary” (id. at 382). The executors subsequently refused to pay the widow’s health care expenses.
Despite the discretion that the words “in their opinion” afforded to the executors, the Van Zandt Court held that the will required the executors to expend estate assets on the beneficiary’s behalf. The Court looked to the plain language of the will to determine the testator’s intent:
“The language of [the] will . . . indicates a design on his part to devote his estate to the support of his wife. It is evident that he regarded her as the first object of his bounty. He makes it clear that, if the income from his property is insufficient for her care, support and maintenance, the corpus is available for that purpose” (id. at 383).
In addition, the Court qualified the executor’s discretion, noting that it was not an “arbitrary” power that the executors could refuse to apply altogether:
“The executors . . . cannot shut their eyes to Mrs. VanZandt’s needs, and neglect to act, or refuse to *379 approve proper and necessary payments which come early within contemplation of the bequest. The testator’s intent to devote his entire estate, if need be, to the support of his wife must not be lost sight of’ (id. at 384).
Rather, the Court suggested that trustees had an affirmative duty to exercise their spending power on expenses that fell within the parameters set forth in the will: “Where a trustee has been given freedom to act according to his own judgment in matters pertaining to another, and he fails, in the opinion of the court, to exercise such discretion in a proper manner, he may be compelled to do that which the trust fairly requires him to do” (id.). By not spending, the executors obstructed the testator’s intent.
As in Van Zandt, it was not sufficient for the trustees merely to prudently invest the trust corpus and to safeguard its assets. The trustees here were affirmatively charged with applying trust assets to Mark’s benefit and given the discretionary power to apply additional income to Mark’s service providers. Both case law and basic principles of trust administration and fiduciary obligation require the trustees to take appropriate steps to keep abreast of Mark’s condition, needs, and quality of life, and to utilize trust assets for his actual benefit.
While the accounting in this trust is not yet complete,[28] their failure to fulfill their fiduciary obligations should result in denial or reduction of their commissions for the period of their inaction.
Next Steps
The current accounting leaves many questions unanswered, particularly since an accurate statement of the opening principal received depends on the administration under both Marie’s will and the somewhat inexplicable[29] Revocable Trust. Without expressing a view, or making any negative assumption, whether or not the estate and Revocable Trust were appropriately *380 administered affects the amount of assets the Mark Trust should rightfully have received.
There is no question that this court has the power to order such accountings sua sponte (SCPA 2205). The power, and, indeed the obligation to do so is especially important where, as here, the only interested person, the sole beneficiary, is under a disability, and there is no one but the court to protect his interests.
Accordingly, H.J.E is ordered to account as executor of the will of Marie H., and he and Chase are ordered to account as co-trustees of the Marie H. Revocable Trust of 1995 within 90 days of the order to be entered following this decision. Further, the cotrustees of the Mark Trust are ordered to file and serve a supplemented and revised accounting herein for proceedings through December 31, 2012, reflecting the proper values of the assets with which the trust was funded, by that same deadline.

. Charles is Mark’s biological brother, and is one year older. He had no contact with Mark from the time Mark was placed at the Anderson School.

. Marie was named trustee, with section 9 (c) of the Revocable Trust providing that, upon her incapacity, her sister Betty and H.J.E should become successor trustees. Section 9 (b) provides that, upon Marie’s death, the Chase Manhattan Bank, N.A. should become a successor trustee with Betty and H.J.E, or the survivor of them.

. According to the guardian ad litem’s report, H.J.E reported that he specializes in estate planning and trusts and estates, and has long been involved in issues around people with intellectual disabilities, having served, inter alia, as co-chairperson of the New York State Association for Retarded Children Trust and on the Board of the Association for the Help of Retarded Children (AHRC). He has lectured on planning for families who have children with intellectual disabilities, and, in fact, met Marie H. after one such lecture.

. According to a letter from H.J.E, his fees are “charged on a flat fee basis,” and not on time spent. Accountant fees were estimated at $10,000.

. These expenses related primarily to the sale of Marie’s co-op apartment.

. According to an affidavit in response to the report of the guardian ad litem in this accounting, discussed below, a federal audit increased the estate *366 tax due by $38,496.44, plus interest of $5,584.65, while there was a refund of New York State taxes of $16,048.87. The affidavit continues, “the attorney fees for the estate were increased by $100,000”; expenses are shown on the 706 totaling $917,217.45.

. Much later, H.J.E argued that the trust should not disqualify Mark from Medicaid eligibility as it was, and was intended to be an “Escher Trust.” A precursor to the statutory supplemental needs trust (EPTL 7-1.12 [eff July 26, 1993]) was established in New York law by Matter of Escher (94 Misc 2d 952 [Sur Ct, Bronx County 1978], affd on op below 75 AD2d 531 [1st Dept 1980], affd 52 NY2d 1006 [1981]). There, the trustee with absolute discretion as to principal distributions could not be directed to transfer the trust corpus to the government entity providing for the life beneficiary’s care (id.).

. Notably, these provisions do not appear in the trust for Mark’s brother, Charles, established on the same day.

. It was the court’s intention, at the same time, to order an accounting in the estate of Marie H., but, inexplicably, that order was never signed.

. It is difficult, if not impossible, to ascertain the amount with which the Mark Trust was funded, and thus also to compare that amount to the closing balance for purposes of evaluating the trustees’ prudence as a manager of trust funds. A rough calculation of the net value of Marie’s estate based on the 706 suggests that the Mark Trust would have received approximately $2.5 million. In a phone communication, the attorneys for Chase have agreed to file corrected schedules, but as reflected in the conclusion herein below, the trustees will be ordered to do so.

. According to H.J.E, the commissions to him were computed in accordance with SCPA 2309.

. Pursuant to article 5.7 of the Mark Trust, a corporate trustee is authorized to receive commissions in accordance with its published rates of compensation in effect when such compensation is payable (see SCPA 2312).

. The original petition sought appointment both as guardian of the person and of the property, but in communications with the Guardianship Clerk, H.J.E made clear that he was not, at that time, applying for the latter.

. ADL’s are activities of daily living and include bathing, feeding oneself, toileting, dressing, etc. Mark was, according to Anderson’s records, unable to perform any of these activities.

. The proceeding was delayed for almost a year as a result of H.J.E’s health-related issues.

. The health care professionals at Anderson wrote that Mark’s aggressive and self-harming behavior would be seriously exacerbated by the changes accompanying a trip from the institution in Straatsburg to the court in Manhattan.

. According to the guardian ad litem, the director of corporate compliance at Anderson, Linda Geraci,
“stated that she is concerned that [H.J.E] has not inquired into Mark’s needs nor has he purchased anything for him — [despite the fact] that Mark’s residence manager has recommended *370 purchasing the following for Mark’s benefit : an acoustic synthesizer and other musical equipment, furniture, clothing, adult swings, slides, climbing equipment, a stereo system and a computer with game software.”

. Because Mark was placed in Anderson before his mother died, Anderson was not aware of the trust, and H.J.E never informed them of its existence. This raised substantial concerns about Mark’s Medicaid eligibility, which were ultimately favorably resolved.

. The information comes primarily from the quarterly reports prepared for formal team meetings at Anderson which Staver attends, in person or by phone, and which she has supplied to the court, as well as her invoices and communications with H.J.P and Chase. In accordance with the appointing order, H.J.P now files extensive yearly reports which include the notes of the quarterly meetings and some additional, usually medical, information (see Matter of Mark C.H., 28 Misc 3d 765, 783 [Sur Ct, NY County 2010] [requiring annual reports in the form described by Mental Hygiene Law § 81.31]).

. That is, had funds been made available for Mark’s “medical needs” from the Mark Trust, he could have avoided the serious aggression and exacerbating effects of the only medication covered by Medicaid.

. Staff utilized massage and soft touching to deal with Mark’s agitation, and the chair was intended to give him the ability to “self soothe.”

. This is automatic, upon a special ed student’s reaching the age of 21, and does not necessarily suggest any particular level of scholastic achievement. It is, however, the transition from one set of government funded benefits to a different and separate system.

. Mark suffers from numerous allergies causing red and itchy eyes, and the air purifier was recommended by staff both for use in his residence and at the day habilitation program.

. Because Mark’s medications have weight gain as a side effect, exercise is critical to maintain him at a healthy weight and BMI.

. According to the residence manager, there was a long wait between trials, and Mark removed his sneakers, behavior he engages in when frustrated. As a result, he was disqualified from the race, but staff “looks forward to Mark’s participation next year and is hopeful there will be environmental accommodations for the participants.”

. Through his 10 years of work with her, and the planning he did, H.J.E unquestionably knew of Mark’s severe disability, and the circumstances which had caused Marie to institutionalize him. Further, H.J.E holds himself out as an expert in the legal needs of children with disabilities, and, in fact, first met Marie after giving a lecture on the subject at AHRC.

. Presumably Chase had conversations with its cotrustee H.J.E But the language of the Mark Trust itself, quoted, supra, was more than enough to put them on notice that this was, as H.J.E characterized it, an Escher trust for a person with disabilities (see n 7 supra).

. Many questions are left open by the accounting as it now stands, and they cannot be fully resolved without accountings in Marie’s estate and the Revocable Trust, ordered below. The guardian ad litem may also wish to amend his objections to more clearly include commissions paid out in light of the abrogation of fiduciary duty.

. It is difficult to understand the use of this Revocable Trust, created on the same day as the execution of Marie’s will and as the Mark and Charles trusts, and like the latter, only nominally funded, as a planning device. Marie’s estate could, as easily and without any negative tax consequences, simply have poured directly into the Mark and Charles trusts. Without an accounting, it is *380 impossible to know if commissions, appropriate or otherwise, were taken, or what expenses, if any, were charged to the Revocable Trust.